**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| TROY JONES | : | CRIMINAL ACTION N0. 11-427 |

**M E M O R A N D U M**

PRATTER, J.                                                    DECEMBER 20, 2011

**INTRODUCTION**

In a one-count indictment, the Government has charged Troy Jones as a felon in

possession of a firearm in violation of 18 U.S.C. §922(g)(1).  Philadelphia police officers

recovered the weapon that forms the basis of this charge during events immediately attendant to

their efforts to stop Mr. Jones for a traffic violation. Mr. Jones now moves to suppress the

introduction of the gun into evidence at trial, arguing that the seizure of the gun violated his

Fourth Amendment rights.

The Court held a hearing on the motion on November 22 and 23, 2011.[1]  For the reasons

that follow, the Court denies the Motion.

---

[1]The hearing was continued to a second day so that a witness subpoenaed by the defense,
Aaron Palmer, who failed to appear on the first day, could be located and convinced to honor the
subpoena without the necessity of involving the formalities of the U.S. Marshal service.

**BACKGROUND**

Troy Jones, driving a green Honda on February 6, 2011 at approximately 6:30 p.m., was observed running a stop sign at 56th & Arch Streets by Philadelphia patrol officers Christopher McMonagle and Jocarr Goodmond. The officers engaged their flashing lights and siren as they followed the Honda south on 56th Street to its intersection with Market Street where the Jones car finally came to a stop diagonally at the corner handicap access to the sidewalk. The officers parked immediately behind Mr. Jones's car. The City's street areas were snowy and icy from recent storms. While it was dark out, there were functioning street lights. A passenger, Dionne Best, was also in the Honda with Mr. Jones, and they were on their way to a Superbowl party.[2]

Believing that the Honda could have responded and pulled over more promptly, and seeing the Honda's spinning wheels as they got out of their patrol car to approach the Honda, the officers were concerned that the driver of the car was endeavoring to flee. Officer McMonagle testified that, as he approached the driver's side of the car, he saw the driver (i.e., Mr. Jones) slightly leaning over and apparently reaching for the right side of his waistband, prompting the officer to draw his own weapon. As he opened the drivers' side door of the Honda, the officer shouted that the driver should cease reaching for his waistband and should keep his hands raised.

The other patrolman, Officer Goodmond, heard his partner repeatedly yelling "stop"; and he then came around the Honda to provide assistance at the drivers' side of the car. He, too, testified that at this point he could see Mr. Jones, via the rear view mirror, reaching for his

---

[2]Ms. Best, as well as Officers McMonagle and Goodmond, Special Agent Patrick Henning and Aaron Palmer, testified during the two-session hearing.

waistband.  Officer Goodmond recounted some of the verbal retorts and other loud and excited

statements Mr. Jones was making in response to Officer McMonagle's directives.  Along with

yelling various epithets, Mr. Jones also seemed to be, according to the officers, still pushing on

the Honda's accelerator, and the car's tires continued to spin.  Officer Goodmond reached into

the car and shifted it into "park" as the two officers struggled with Mr. Jones who, while

struggling, continued to proclaim that he was "not resisting."

During this time, Officer McMonagle continued to give unheeded orders to Mr. Jones

and saw him continue to reach into his waistband.  The officers, worried that Mr. Jones was

reaching for a gun, finally succeeded in pulling him from the car.  As the struggle ensued,

Officer McMonagle testified that he heard an object drop from Mr. Jones's person to the ground

(an object the officers testified was, in fact, the gun that is the subject of this motion). Officer

Goodmond quickly thereafter wrestled Mr. Jones to the ground and secured him in handcuffs.

Mr. Jones continued his verbal challenges to the officers as he was moved into the police car.

Officer McMonagle testified that he recovered the gun from the street, within two feet of the

drivers' side of the car.  This appears to have been the basic location where the officers said the

gun dropped while they were struggling with Mr. Jones.  Thereafter, the officers arranged for the

car to be moved by the Parking Authority; and background checks confirmed that Mr. Jones had

been driving without a valid license and that the car was registered to him.

The foregoing is a relatively straightforward account of the events as testified to by the

two officers.  Ms. Best, the passenger in the Honda, tells a somewhat different story.  Ms. Best

claims that the two officers grabbed Mr. Jones and "snatched" him out of the front seat, forced

him up against the car and then wrestled him to the ground, following which they searched,

cuffed and moved him into the patrol car.  According to Ms. Best, after the physical altercation

with Mr. Jones, she was told by the police to get out of the Honda and go to stand at or near the

rear of the car.  She testified that she then saw the officers searching the ground outside the

passenger side of the car and then the front interior of the car.  Ms. Best admitted that she did not

see either officer pull anything out of the car.  Indeed, Ms. Best did not see where the gun came

from, though she recalled seeing one of the officers with it some minutes after she was asked to

move to the rear of the Honda.

Another defense witness, Aaron Palmer, happened to be making a pizza delivery at the

56th and Market Street location at the time of the February 6 police-Jones interaction.  Mr.

Palmer is a friend of Mr. Jones.  Mr. Palmer testified that, from a location of approximately one

and a half car lengths behind the police car that was itself behind Mr. Jones's car, he saw the

officers force Mr. Jones from the car and throw him to the ground.  He said he saw the police

search the car briefly and, although he could not state from which location of the car, Mr. Palmer

said that one of the officers pulled a gun from the car.  Mr. Palmer acknowledged that he was not

steadily and without interruption watching the police and Mr. Jones.  Mr. Palmer also admitted

to having previously said to a defense investigator that he did not actually know what the police

had removed from the Jones car.  At another time, according to Government witness Special

Agent Henning, Mr. Palmer explained that he assumed the police had pulled a gun from Mr.

Jones's car because he knew Mr. Jones carried a gun.

Special Agent Henning also testified about his review of a recording[3] of a conversation

---

[3]The Court received into evidence a transcript of the recording.  The defense, acknowledging the material accuracy of the transcript as compared to the voice recording, raised no objection.

between Mr. Jones and Ms. Best that took place on February 7, after Mr. Jones had been arrested

and was in jail.  The upshot of the conversation, absent the slang, profanity and rhetorical filler,

was the suggestion that perhaps Ms. Best could or should describe the gun as hers because her

exposure was less than Mr. Jones's was for possession of a firearm.

Following the hearing, the Court extended both the defense and the Government the

opportunity to supplement their written submissions and to review the transcript of the hearing

for purposes of completing their respective arguments if they so chose.

**DISCUSSION**

The officers' initial traffic stop of the Jones Honda was lawful.  "It is well established

that a traffic stop is lawful under the Fourth Amendment where a police officer observes a

violation of the state traffic regulations."  United States v. Moorefield, 111 F.3d 10, 12 (3d Cir.

1997).  In this case, Officers McMonagle and Goodmond saw Mr. Jones disregard a stop sign, a

traffic violation under Pennsylvania law.  See 75 Pa. C.S.A. §3323(b).

Nonetheless, Mr. Jones argues that the search and seizure of the gun during the traffic

stop violated his Fourth Amendment rights.  The police witnesses say they had an appropriate

safety concern that prompted their forced removal of Mr. Jones from the car and that the gun fell

from his person into their plain view in the ensuing scuffle.  The defense argues the officers did

not find the gun as they claimed, but rather found it during a subsequent, unfettered search of the

car interior.  Weighing the evidence presented, the Court finds the officers' combined version of

the events plausible and their overall testimony credible.  Even if Mr. Jones was not actually

trying to evade them, the officers convincingly testified that they believed Mr. Jones could and

should have pulled over and stopped more promptly.  Then they saw his car's tires spinning as if

he intended to drive away, coupled with observing movement by the car's driver consistent with possibly pulling a weapon from one's waistband. Under the circumstances extant, the officers were reasonably processing information that put them on appropriate alert to proceed with utmost caution for their safety, or even to weigh as well whether a misdemeanor crime of attempting to elude a police officer was occurring under 75 Pa. C.S.A. §3733. Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000). See also Maryland v. Prenzle, 540 U.S. 366, 370-71 (2003); United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004); United States v. Bruton, 288 F.3d 91, 98 (3d Cir. 2002). The totality of the circumstances will dictate how the Court measures the reasonableness of the officers' suspicions and subsequent actions. United States v. Focareta, 283 Fed. Appx. 78, 83 (3d. Cir. 2008) (citing United States v. Sokolow, 490 U.S. 1, 8 (1989); United States v. Cortez, 449 U.S. 411, 417 (1981)). Under these circumstances -- even as described in part by the defense witnesses -- the Court concludes the officers behaved reasonably.

Once they stopped Mr. Jones, the officers were allowed to remove him (and his passenger, Ms. Best) from the car and conduct a pat down - - - and, given Mr. Jones's loud verbal reactions and apparent lack of physical cooperation, to use force to do so. Arizona v. Johnson, 555 U.S. 323, 327 (2009); United States v. Hensley, 469 U.S. 221, 235-36 (1985); Michigan v. Long, 463 U.S. 1032, 1047 (1983); Terry v. Ohio, 392 U.S. 1, 20-22 (1968); Moorefield, 111 F.3d at 13-14.

With respect to the competing arguments as to the location of the gun, the Court compares the plausibility of the police account with the ambivalence, inconsistency and/or equivocation of the offerings by Ms. Best and Mr. Palmer. The officers' testimony was more complete, compelling and common sensible than that of either of the defense witnesses.

6

Accordingly, the police had probable cause to stop Mr. Jones for driving through a stop sign; they had reasonable suspicion to remove him from his car, and they properly searched his person thereafter, leading to the seizure of the gun that was the object of the defense motion.

**CONCLUSION**

For the reasons explained above, the defense motion to suppress introduction at trial of the gun retrieved on February 6, 2011 is denied in the Order accompanying this Memorandum.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge